**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO FLORIDA**

| | |
|---|---|
| In re:<br><br>LIFE AT SEA CRUISES, INC.,<br><br>Debtor. | Chapter 7<br><br>Case No. 6:24-bk-03756-LVV |

**DEBTOR'S MOTION TO**
**VOLUNTARILY DISMISS CHAPTER 7 BANKRUPTCY CASE**

Life as Sea Cruises, Inc. (the "Debtor"), by and through its undersigned counsel, respectfully moves the Court for an order directing dismissal of this chapter 7 case pursuant to 11 U.S.C. § 707(a). In support of this Motion, the Debtor submits the Declaration of L. William Porter III filed herewith (the "Porter Declaration") and the exhibits annexed thereto and represents as follows:

## INTRODUCTION

1. The Debtor's chapter 7 case should be dismissed under 11 U.S.C. § 707(a) for "cause" because (i) the Debtor has no creditors, (ii) dismissal is in the best interest of the Debtor, and (iii) no parties would be prejudiced by dismissal.

2. The Debtor was created as a single purpose entity for the purpose of creating a three-year world cruise. The project, however, was unsuccessful for a number of reasons. As a result, the Debtor decided it was necessary to winddown.

3. Notwithstanding its need to winddown, the Debtor's case should be dismissed because a chapter 7 bankruptcy case, and this Court, is not the appropriate forum to resolve the remaining issues needed to dissolve and would only unnecessarily cannibalize the limited estate assets available.

4. As set forth below, the gravamen of this case is a state court default judgment in which the Debtor disputes the validity of the underlying claims. This is a two-party dispute between the Debtor and the Judgment Plaintiffs (as defined below). Denial of dismissal would harm the Debtor by preventing it from challenging the Judgment Plaintiffs' claims in the State Court Action. No parties—including the Judgment Plaintiffs—would be prejudiced by dismissal because they may pursue their claims outside of bankruptcy.

5. Furthermore, the Debtor has no creditors. The prospective cruise customers are creditors of a separate entity, Miray Cruises Ltd., each of which have acknowledged that they hold no claims against the Debtor.

6. Accordingly, there is no cognizable purpose for the chapter 7 proceeding, and it would be in the best interest of the Debtor and its creditors to allow the Debtor to winddown outside of bankruptcy, with all of the Judgment Plaintiffs' rights, and any other parties' rights, preserved with respect to their ability to enforce their claims.

## BACKGROUND

### *A. The Debtor's Business*

7. Mirayint Cruise Management Ltd. a/k/a Miray Cruises ("Miray") is a company organized in the Turkish Republic of Northern Cyprus since at least July 6, 2022, and its principal and controlling shareholder is Vedat Ugurlu.

8. Miray is a ship management company, offering unique cruise services in Greece and Turkey. Miray owns the M/V Gemini cruise ship.

9. The Debtor is a company that was formed to advertise and market Miray's Life at Sea Cruises project in the United States.

10. On January 30, 2023, Life at Sea Cruises, Inc. incorporated in Florida with Vedat Ugurlu as designated representative.

11. On April 17, 2023, Vedat Ugurlu applied for the Life at Sea Cruises trademark. The date of first use of the Life at Sea Cruises name was January 25, 2023.

***B. The Debtor's Relationship with Mikael Petterson***

12. On December 1, 2022, Miray and Fourneau International Limited ("Fourneau") entered into a Consulting Services Agreement (the "Consulting Agreement"). The Consulting Agreement was executed by Vedat Ugurlu on behalf of Miray and Mikael Petterson on behalf of Fourneau. Pursuant to the Consulting Agreement, Fourneau would provide services to Miray, and Fourneau would receive $20,000 per month and a 4% commission on all gross sales after guest deposits have been paid. If deposits were returned to the customers, then Fourneau would not receive a commission. A true and correct copy of the Consulting Agreement is attached as Exhibit A to the Porter Declaration.

13. The Agreement had a three-month term beginning on December 1, 2022. The Agreement included a non-compete provision during the term of the Agreement.

14. On February 28, 2023, the Agreement expired. Miray and Fourneau did not enter into any other agreements. Further, Fourneau and the Debtor did not enter into any agreements.

15. On March 1, 2023, the day after the non-compete expired, Petterson and Angela Miclat began hiring sales associates, ostensibly to find cruise customers for Miray's Life at Sea Cruises project. However, at no time were Petterson and Miclat employees or authorized representatives of the Debtor. Petterson and Miclat did not receive approval to sign agreements on behalf of the Debtor and therefore misappropriated the Debtor's name and trademark when they signed commission agreements on behalf of the Debtor.

16. On March 7, 2023, one week after the non-compete expired, Petterson emailed a competitor of Miray, Victoria Cruises, stating that "we launched LifeatSeacruises.com on Wednesday and "without another lead already have the leads to sell out by the end of the month. We

actually have enough leads to fill our ship and yours, let me know if you want to discuss a potential solution. Obviously we can't do 3% at this point given our marketing spend, but a 10% number is not out of the question. We are already out of balconies and could sent them your way." A true and correct copy of the email is attached as Exhibit B to the Porter Declaration.

17. On March 1, 2023 and May 10, 2023, Petterson and Miclat executed—on behalf of the Debtor and without authority—sales commission agreements (the "Sales Commission Agreements") with Holger Mark Doerr, Anne Alms, Kathryn Villalba, and Tobias Lindsten (collectively, the "Judgment Plaintiffs"). True and correct copies of the Sales Commission Agreements are attached as Exhibit C to the Porter Declaration. The Sales Commission Agreements provided that the Judgment Plaintiffs would receive 2% of the net sales of the Product they sold.

18. Customers interested in participating on the three-year cruise executed a Guest Contract (the "Guest Contracts") with Miray Cruises Ltd., an entity offering and operating the Life at Sea Cruises brand. A true and correct copy of the Guest Contract is attached as Exhibit D to the Porter Declaration.

19. On May 21, 2023, Petterson posted on social media, targeting Miray's customers: "I as founder and managing director of Life at Sea Cruises will be happy to share with anyone what is going on. I on May 3rd demanded critical answers from Miray, they refused to answer my questions on where money will be kept, status of FMC bond, verified ports, escrow balances. Miray kept us from accessing Gemini engine room and lied to all of us about the status of the Gemini. The Gemini is completely unseaworthy, cannot get USPH certified, and will never be able to complete a world cruise. I decided to refund everyone their credit card deposits 3 weeks ago and pushed the payment date to June 30 until I can better understand what Miray plans. Miray told me to not ask questions and just collect money they hired me to do. Feel free to reach out to me for complete email trails.

Also call the Federal Maritime Commission at [number] to file a complaint." A true and correct copy of the social media post is attached as Exhibit E to the Porter Declaration.

20. On June 4, 2023, Petterson continued to misappropriate Debtor's name and trademark when he updated his LinkedIn status to state that he was "Founder" of the Debtor.

21. On June 7, 2023, Petterson posted online on the Debtor's Founders Page & Community Information: "The FMC bond requirement of $32m for customer protection is now no longer required as there will be no passengers embarking in US territory. No performance guarantee, no bond, no escrow, no transparency, just trust us. The lack of USPH requirement, coast guard inspection are just bonuses. . . . We are busy on our next project, Villa Vie Residences, our original plan which make the residents the majority stakeholders and creators of the project itself. . . ." A true and correct copy of the online post is attached as Exhibit F to the Porter Declaration.

22. On June 21, 2023, Petterson posted online targeting Miray's customers: "I am very excited to announce that the founders of Life at Sea Cruises (16 of 17 of us) are having our first webinar tomorrow June 22nd at 6pm EST with our new project Villa Vie Residences." A true and correct copy of the online post is attached as Exhibit G to the Porter Declaration.

23. Petterson, Miclat, and all four Judgment Plaintiffs now work together at a cruise company that Petterson started after using the Debtor's platform to generate cruise customers before defaming the Debtor and stealing its customers.

***C. State Court Default Judgment***

24. On August 23, 2023, the Judgment Plaintiffs filed a complaint (the "Complaint") in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida (the "State Court Action").

25. The Complaint alleged breach of contract and wage claims based on the Sales Commission Agreements.

26. On February 22, 2024, the Debtor's counsel in the State Court Action withdrew from the case prior to moving to dismiss the case or otherwise challenging the complaint's allegations.

27. On March 29, 2024, the Judgment Plaintiffs moved for entry of court default for the Debtor's failure to secure counsel.

28. On April 11, 2024, the Circuit Court entered the *Order Granting Motion for Entry of Court Default*. On April 30, 2024, the Circuit Court entered the *Order Granting Verified Motion for Entry of Final Judgement* (the "Default Judgment").

29. The Debtor seeks to move to vacate or appeal the Default Judgment because the Sales Commission Agreements were entered by Petterson and Miclat without the Debtor's knowledge or authority.

***D. Bankruptcy***

30. After the entry of the Default Judgment, the Judgment Plaintiffs engaged in a heavy handed and aggressive attempt to enforce the Default Judgment against the Debtor notwithstanding their knowledge that Petterson and Miclat did not have the authority to execute the agreements on behalf of the Debtor.

31. Additionally, the Debtor's owner determined that the project was unsuccessful as a result of a number of factors including Petterson's defamation and attempt to divert customers away from the project. As part of the winddown, Miray began to return deposits.

32. The Debtor was advised that it should file for bankruptcy. As a result, on July 23, 2024, the Debtor filed a voluntary petition for relief pursuant to chapter 7 of the Bankruptcy Code without the Debtor's prior counsel doing any diligence as to the propriety of the Judgment Plaintiffs' claims asserted against the Debtor. Arvind Mahendru was appointed as Chapter 7 trustee (the "Trustee").

33. On July 23, 2024, the Debtor filed the *Notice of Suggestion of Bankruptcy* in the State Court Action.

34. On August 6, 2024, the Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket No. 10]. The Debtor listed no creditors. For example, on Schedule D, no creditors are listed, and eight individuals or entities on Schedule E/F, consists of (i) the four Judgment Plaintiffs, which as explained below are not creditors of the Debtor, and (ii) four prospective cruise customers who are not creditors of the Debtor but of Miray Cruises Ltd.

35. Upon learning of the improper advice by its initial counsel in this case and that its counsel was not capable of handling a matter such as the Debtor's, the Debtor sought to obtain new bankruptcy counsel. On November 7, 2024, after motion by the Debtors, the Court entered the *Order Granting Joint Motion for Substitution of Counsel for Life at Sea Cruises, Inc.* [Docket No. 27].

**ARGUMENT**

36. Section 707(a) states that a bankruptcy judge may allow dismissal of a Chapter 7 Bankruptcy for "cause." Although this provision does not specifically provide for a debtor's motion to dismiss a voluntarily filed petition, courts have routinely held that section 707(a) applies to such cases. *See, e.g., Turpen v. Eide (In re Turpen)*, 244 B.R. 431, 434 (B.A.P. 8th Cir. 2000); *In re Schwartz*, 58 B.R. 923, 925 (Bankr. S.D.N.Y. 1986); *United States v. McDaniel (In re McDaniel)*, 363 B.R. 239, 243 (M.D. Fla. 2007) ("Section 707(a) of the Bankruptcy Code provides for the voluntary dismissal of a Chapter 7 bankruptcy petition, after notice and hearing, 'only for cause.'"). Under section 707(a), "the debtor has no absolute right to dismissal of a Chapter 7 case." *Turpen*, 244 B.R. at 434. While a debtor seeking dismissal has the burden of showing "cause," "[t]he Bankruptcy Code does not define 'for cause,' and the three enumerated examples in § 707(a) are illustrative, not exclusive." *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re*

*Piazza)*, 719 F.3d 1253, 1261 (11th Cir. 2013); *Smith v. Geltzer*, 507 F.3d 64, 72 (2d Cir. 2007). Courts have thus developed a variety of tests and standards to determine if the Debtor/movant has shown "cause." *See In re Jabarin*, 395 B.R. 330, 337-338 (Bankr. E.D. Pa. 2008). In applying section 707(a), the Seventh Circuit "adhere[s] to the ordinary meaning of 'cause,' as authorizing dismissal when adequate or sufficient reason exists for such an action." *Piazza*, 719 F.3d at 1262.

37. As a result, courts apply a balancing test wherein the benefit to the debtor is weighed against the detriment to his creditors. Similarly, the courts "measure the prejudice to the debtor triggered from a denial of the Motion against the prejudice to creditors if the case is dismissed." *In re Williams*, 305 B.R. 618, 620 (Bankr. D. Conn. 2004). Dismissal may also be granted upon a finding that it would be in the best interest of all parties in interest. *Smith v. Geltzer*, 507 F.3d 64, 72 (2d Cir. 2007). The best interest of the debtor "lies generally in securing an effective fresh start upon discharge and in the reduction of administrative expenses leaving him with resources to work out his debts" while for creditors, the goal was to avoid prejudicial delay wherein the debtor can forestall collections from the creditor for a great deal of time. *Id.* In *Smith*, the court found that the detriment to the debtor, which included a drawn-out litigation process, the administrative fees of the Trustee, and the difficulty of securing future credit due to Bankruptcy discharge, outweighed the prejudice to the creditors, whom while forestalled from collecting for over two years during the pendency of the bankruptcy case, would be entitled to receive immediate and full supervised repayment of their claims upon dismissal. *Id.*

38. Other courts in determining whether cause exists have also considered the following factors:

(1) whether all of the creditors have consented;
(2) whether the debtor is acting in good faith;
(3) whether dismissal would result in a prejudicial delay in payment;
(4) whether dismissal would result in a reordering of priorities;

(5) whether there is another proceeding through which the payment of claims can be handled; and

(6) whether an objection to discharge, an objection to exemptions, or a preference claim is pending.

*In re Aupperle*, 352 B.R. 43, 45-46 (Bankr. D.N.J. 2005). In *Aupperle*, the court held that there was no prejudice to creditors even though the Debtor had provided no evidence of an ability pay all of her creditors, because Creditors would have an opportunity to obtain judgment liens against Debtor's real property that could not be defeated outside the bankruptcy.

39. Here, there is ample cause to dismiss the Debtor's Chapter 7 case.

40. *First*, as set forth below, the Debtor has no creditors. Dismissal is in the best interest of the Debtor and will not prejudice the Judgment Plaintiffs and cruise customers.

41. *Second*, the Judgment Plaintiffs and cruise customers are not subject to any other form of prejudice in the event of a dismissal, as there has been a short time period since the bankruptcy filing. Additionally, while the Debtor disputes the validity of the Judgment Plaintiffs' claims, as set forth below, all of the Judgment Plaintiffs' rights in connection with the State Court Action and its ability to enforce any judgment are preserved.

42. *Third*, the filing was made in good faith, and there are no major secured or preferential claims that would be disadvantaged by a dismissal. Additionally, dismissal is not being sought to avoid any obligation but rather to streamline the process of resolving a two-party dispute between the Judgment Plaintiffs and the Debtor. There are no other parties involved in this case and to continue to this case will only add another level of complexity and fees that are not needed to resolve the two-party dispute.

***A. The Judgment Plaintiffs Are Not Creditors of the Debtor***

43. The Judgment Plaintiffs are not creditors of the Debtor. The underlying issues in the State Court Action have not been litigated, and the Debtor disputes the validity of the Judgment

Plaintiffs' claims. The State Court Action is based on the Sales Commission Agreements, which were entered into on behalf of the Debtor by individuals who were neither employees or authorized persons acting on the Debtor's behalf. Petterson and Miclat signed the commission agreements on the Debtor's behalf without the Debtor's knowledge, after Petterson's consulting contract with Mirayint terminated, and during the time that Petterson was actively seeking cruise customers for other cruise companies, including his own.

44. The Debtor seeks to move to vacate or appeal the Default Judgment, however the State Court Action is stayed during the pendency of this Chapter 7 case. Only the Trustee may appeal the State Court Action, but the Trustee is conflicted in pursuing an appeal. A successful appeal would solidify the fact that there are no creditors of the Debtor. The Court should dismiss this Chapter 7 case so that the Debtor may pursue vacating or appealing the Default Judgment. Denying dismissal of this Chapter 7 case would prejudice the Debtor by preventing it from challenging the Default Judgment and actually litigating the State Court Action.

45. Dismissal of this case will not prejudice the Judgment Plaintiffs because the parties will be able to litigate the merits of the Judgment Plaintiffs' claim in the State Court. And, if the Judgment Plaintiffs are successful on the merits, all of their rights are preserved including the right to take discovery and enforce their claims against any assets of the Debtor. In fact, it is clear from the Debtor's schedules, the 341 meeting, and the state court action, that the gravamen of this case is a two-party dispute between the Judgment Plaintiffs and the Debtor. Courts have frequently dismissed bankruptcy cases, whereas here, the primary issue is a two-party dispute. *See generally, In re JWB Overland LLC*, 656 B.R. 518 (Bankr. M.D. Fla. 2024) (dismissing bankruptcy in no asset, no discharge chapter 7 case involving a two-party dispute with a defunct debtor, as there was only harm resulting from a delay of the state court litigation); *In re Ripley & Hill, P.A.*, 176

B.R. 596 (Bankr. M.D. Fla. 1994) (dismissing bankruptcy because there was no benefit by continuing the case and there was harm resulting from delay in liquidating a creditor's state court claim).

46. Here, it is clear the only issue is a two-party dispute between the Debtor and the Judgment Plaintiffs. There is no benefit from continuing this chapter 7 case, but rather it will cause harm by delaying the parties' ability to litigate the merits of the Judgment Plaintiffs' claims.

***B. The Cruise Customers Are Not Creditors of the Debtor***

47. The Debtor was not a party to any Guest Contracts, which were entered into between the cruise customers and Miray Cruises Ltd. A true and correct copy of the Guest Contract is attached as Exhibit D to the Porter Declaration. Miray was the operating entity responsible for obtaining the vessel and making other expenditures needed to operate the three-year cruise. The Debtor, on the other hand, was not the local marketing entity. However, as a result of Petterson's conduct, including defamation and an attempt to divert customers away from the Life at Seas Cruises project, the project was unsustainable. Thus, Miray began to winddown the Debtor.

48. Importantly, the Debtor was not a party to the Guest Contracts and had no obligations thereunder. Miray—not the Debtor—is obligated under the Guest Contracts to refund the customers' deposits. *See generally Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067 (11th Cir. 2003) ("Generally, a contract does not bind one who is not a party to the contract, or who has not in some manner agreed to accept its terms."). Indeed, these customers expressed in writing that they received or expected to receive refunds from Mirary – not the Debtor. True and correct copies of the customers' emails are attached as Exhibit H to the Porter Declaration.

49. As a result, there is no prejudice to the cruise customers if the Chapter 7 case is dismissed because they may pursue their claims against Miray outside of bankruptcy.

## CONCLUSION

50. The Debtor in this case has met the burden of proof that its dismissal is for "cause." It stands to reason, then, that under any other balancing test or standard subsequently adopted by this Honorable Court, the Debtor would likewise show that cause has been established. Therefore, the Debtor has met its burden of proof in showing "cause" for its voluntary dismissal; there is no prejudice to potential creditors from it being granted a dismissal of this case and dismissal is in the best interest of the Debtor.

WHEREFORE, the Debtor respectfully requests that the Court grant this Motion to Voluntarily Dismiss Chapter 7 Bankruptcy and grant any such other relief as the Court deems appropriate under the circumstances.

Dated: December 4, 2024

**LATHAM, LUNA, EDEN & BEAUDINE, LLP**

*/s/ L. William Porter III*
L. William Porter III
201 S. Orange Avenue, Suite 1400
Orlando, FL 32801
Phone: (407) 481-5800 (Main)
Fax: (407) 481-5801
bporter@lathamluna.com
*Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO FLORIDA**

| | |
|---|---|
| In re:<br><br>LIFE AT SEA CRUISES, INC.,<br><br>Debtor. | Chapter 7<br><br>Case No. 6:24-bk-03756-LVV |

**DECLARATION OF L. WILLIAM PORTER III**
**IN SUPPORT OF DEBTOR'S MOTION TO**
**VOLUNTARILY DISMISS CHAPTER 7 BANKRUPTCY CASE**

I, L. William Porter III, declare as follows:

1. I am an attorney duly admitted to practice law in the State of Florida and a partner at the law firm of Latham, Luna, Eden & Beaudine, LLP.

2. Latham, Luna, Eden & Beaudine, LLP represents Life at Sea Cruises, Inc. (the Debtor") and I submit this declaration in support of *Debtor's Brief in Support of Debtor's Verified Motion to Voluntarily Dismiss Chapter 7 Bankruptcy Case* (the "Motion").[1]

3. A true and correct copy of the Consulting Agreement is attached hereto as Exhibit A.

4. A true and correct copy of the March 7, 2023 email from Mikael Petterson to Victoria Cruises is attached hereto as Exhibit B.

5. True and correct copies of the Sales Commissions Agreements are attached hereto as Exhibit C.

6. A true and correct copy of the Guest Contract is attached hereto as Exhibit D.

7. A true and correct copy of the May 21, 2023 social media post by Mikael Petterson is attached hereto as Exhibit E.

---

[1] All undefined capitalized terms used herein shall have the meanings given to them in the Motion.

8. A true and correct copy of the June 7, 2023 online post by Mikael Petterson on the Debtor's Founders Page & Community Information is attached hereto as Exhibit F.

9. A true and correct copy of the June 21, 2023 online post by Mikael Petterson is attached hereto as Exhibit G.

10. True and correct copies of the cruise customers' emails regarding refunds from Miray are attached as Exhibit H to the Porter Declaration.

Dated: December 4, 2024

*/s/ L. William Porter III*
L. William Porter III

# EXHIBIT "A"

# CONSULTING SERVICES AGREEMENT

**This Consulting Services Agreement** ("Agreement") is entered into this 1st day of December 2022 (the "Effective Date") by and between Mirayint Cruise Management Ltd. with its principal office at Namik Kemal Cad., Yetkili is merkezi No: 6, Mersin 10 Turkey, SLBT No: 869,(The "Client") and Fourneau International Limited of 40 Silicone Avenue, Cyber City 77201, Ebene, Mauritius (The "Consultant").

**WHEREAS**, Client desires to engage Consultant for the purpose of providing consulting services in the area of program development of residential cruises, including, but not limited to development of the marketing strategy and initial sales of the residential cruises, and such other areas as may be agreed upon by the parties from time to time (the "**Services**"); and

**WHEREAS**, Consultant desires to perform the Services in accordance with the terms and conditions set forth below.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein contained, and for other valuable consideration acknowledged by each of the parties to be satisfactory and adequate, the parties covenant and agree as follows:

1. **SERVICES**. Consultant shall perform the Services for the Client and Consultant agrees to perform such Services, as agreed to in writing by the parties. Work scope to be reviewed and approved in writing and in advance by the parties in a separate Statement of Work ("**SOW**") attached hereto and made a part hereof as **Exhibit A**.

2. **TERM.** The Term of this agreement begins on the Effective Date and continues for a period three (3) months, unless otherwise terminated in accordance with the provisions of this Agreement.

3. **COMPENSATION.** The Client shall pay to Consultant $20,000 per month for Services rendered to the Client under this Agreement. Payment will be made by the 1st of each month if Consultant's invoice has been received prior to the payment date. If the invoice has not been received by the 1st of the month, payment will be made within 7 days after receipt of Consultant's invoice.

The Client shall pay Consultant a 4% commission on gross sales after guest deposits have been paid and only after the decision has been made to move the project forward If guest deposits are returned due to cancellation of the project, no commission shall be owed to Consultant. Any commissions the Consultant agrees to pay in secondary agreements with brokers and sales agents are the responsibility of the Consultant.

In addition, Client shall reimburse Consultant for all reasonable expenses incurred at the direction of the Client, including, but not limited to, travel expenses, other than those incurred by Consultant while traveling to and from Consultant's home or office and established sales office, equipment, and telecommunications expenses, provided parties have agreed in writing to any expenses in advance of them being incurred by Consultant. Consultant shall follow Client's Travel Policy attached hereto and made a part hereof as **Exhibit B**. Consultant will issue an invoice monthly for the Services performed and expenses incurred, attaching actual bills, receipts or other evidence of expenditures.

4. **INDEPENDENT CONTRACTOR**. Consultant will furnish the Services to Client as an independent contractor and not as an employee of Client or any entity that is a parent, subsidiary, related or affiliated company thereof. Nothing herein shall be construed to imply a joint venture, partnership, employer-employee or principal-agent relationship between the parties. For the purposes of this Agreement, Consultant and its employees (including Consultant) shall not be entitled to any employee benefits, including, without limitation, any medical coverage, life insurance, participation in Client's retirement plan, etc., provided to employees of Client, or any entity that is a parent, subsidiary, related or affiliated company thereof.

5. **FUTURE EMPLOYMENT**. Upon completion of this Agreement, Client agrees to hire consultant as an employee of its company to continue the launch, marketing, sales and any other work that may need to

be performed relating to the residential cruise project so long as Consultant's work has been completed as outlined in this Agreement and in accordance with Section 12.

6. **TAXES**. Consultant bears all liability or responsibility for the reporting and payment of taxes assessed on compensation hereunder or otherwise in connection with Consultant's employment of its own employees (including Consultant), other than sales taxes which shall be billed in accordance with applicable laws. Notwithstanding the foregoing, however, if Client, or any entity that is a parent, subsidiary, related or affiliated company thereof, is required to pay or withhold any taxes or make any other payment with respect to fees payable to Consultant and/or its own employees (including Consultant), Consultant will reimburse Client, or such parent, subsidiary, related or affiliated entity, in full for taxes paid For avoidance of doubt, Consultant will indemnify, defend and hold Client, its directors, officers, employees and agents and its parent, subsidiary, related or affiliated companies harmless against any claim or liability (including penalties) resulting from Consultant's failure to any such taxes or contributions, or its failureto file any such tax forms.

7. **CONSULTANT NOT TO ENGAGE IN CONFLICTING ACTIVITIES**. During the Term of this Agreement, Consultant will not enter into any activity, employment, or business arrangement that conflicts with Client's interests or would prevent performance of Consultant's obligations under this Agreement. In view of the sensitive nature of the Services that Consultant will provide pursuant to this Agreement, Client shall have the option of terminating this Agreement at any time and immediatelyif, in Client's sole judgment, such a conflict of interest exists or is imminent. Consultant will advise Client in writing of Consultant's position with respect to any activity, employment, or business arrangement contemplated by Consultant that is relevant to this Section 7. Consultant also agrees to disclose any such plans to Client in writing prior to their implementation.

8. **WORK PRODUCT AND INTELLECTUAL PROPERTY**.

(a) All Work Product (as defined below), and all right, title and interesttherein, shall be and at all times remain the exclusive property of Client, and Consultant shall have no rights therein. All Work Product shall be a "**work made for hire**." To the extent that such Work Product shall not constitute a work made for hire, Consultant hereby expressly assigns to Client all right, title and interest in and to all Work Product. For the purposes of this Agreement, "**Work Product**" means all work product of Consultant produced, developed or discovered by Consultant pursuant to or in connection with this Agreement and/or the Consulting Services, including all reports, analyses, data, application designs, materials, ideas, know-how, information, software, specifications, inventions, writings, discoveries, patents, copyrights, trademarks, trade secrets and designs, along with all proprietary and other rights that may now or in the future exist therein or be appurtenant thereto related to the work performed for Client by Consultant Consultant shall mark all Work Product with Client's copyright or other proprietary notice as directed by Client and shall take all actions deemed necessary by Client to perfect Client's rights therein, at Client's expense.

(b) If this Agreement is Terminated pursuant to Section 12 or for non-performance of Consultant, then Client shall have the right to use the Work Product to continue the launch of the residential cruise project.

9. **REPRESENTATIONS AND WARRANTIES**. Consultant represents and warrants that it is fully qualified to provide the Services and that it will perform the Services in a professional, ethical, and workmanlike manner and will give Client the full benefit of its knowledge, experience, judgment and expertise in rendering advice to Client on the matters and subjects related to the Services. Consultant further represents and warrants that: (i) has the right to enter this Agreement and fully perform its obligations and provide the Services and/or materials hereunder, free of any conflict with any other obligations by which it may be bound; and (ii) neither the performance of the obligations and agreements, nor the furnishing of the Services and/or materials hereunder violates or infringes the intellectual property rights or any other rights of any other party or contravenes the laws or regulations of any governmental, regulatory or judicial authority applicable to it.

10. **OUTSIDE SERVICES.** Consultant shall not use the service of any other person, entity, or organization in the performance of Consultant's duties without the prior written consent of an officer of the

Client. Should the Client consent to the use by Consultant of the services of any other person, entity, or organization, no information regarding the services to be performed under this Agreement shall be disclosed to that person, entity, or organization until such person, entity, or organization has executed an agreement to protect the confidentiality of the Client's Confidential Information and the Client's absolute and complete ownership of all right, title, and interest in the work performed under this Agreement.

**11. CONFIDENTIALITY.**

(a) Confidential Information. The terms and conditions of this Agreement and any information and data of any nature including, but not limited to, all data transmitted by and between the parties in connection with this Agreement (whether before or after the Effective Date hereof), any technical, business plans, marketing, promotional, trade secrets, techniques and other non-public information from or about the disclosing party that would normally be treated as confidential by the disclosing party in the ordinary course of business shall be deemed "**Confidential Information**". The parties acknowledge that all rights to such Confidential Information, whether oral or written, disclosed to the receiving party are reserved by the disclosing party. Except as expressly permitted by this Agreement, all Confidential Information (a) shall be held and protected by the recipient in strict confidence with at least the same degree of care that the recipient uses to safeguard its own Confidential Information; (b) shall be used by the recipient only as required to render performance or to exercise rights and remedies under this Agreement; (c) shall not be produced or copied, in whole or in part, except as necessary for its authorized use under this Agreement; and (d) shall not be disclosed to any other third parties without the prior written consent of the owner. The obligations of confidentiality will not apply to information that (a) is properly known to the receiving party at the time of disclosure to the receiving party; (b) has become publicly known through no wrongful act of the receiving party; (c) has been rightfully received from a third party not under a nondisclosure obligation with respect to the information; (d) has been approved for release by written authorization of the disclosing party; or I is independently developed by the receiving party. Upon the expiration or termination of this Agreement, the receiving party will return all Confidential Information to the disclosing party. It is expressly agreed that the remedy at law for breach of the agreement set forth in this Section 11(a) may be inadequate and that the parties shall, in addition to any available remedies, be entitled to seek injunctive relief to prevent breach or threatened breach thereof.

(b) Disclosure Required by Law. The receiving party may disclose the Confidential Information of the disclosing party in response to a request for disclosure by a court or another governmental authority, including a subpoena, court order, or audit-related request by a taxing authority, if the receiving party: (i) promptly notifies the disclosing party of the terms and the circumstances of that request, (ii) consults with the disclosing party, and cooperates with the disclosing party's reasonable requests to resist or narrow that request, (iii) furnishes only information that, according to written advice of its legal counsel, the receiving party is legally compelled to disclose, and (iv) uses reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded the information disclosed.

**12. TERMINATION.** The Client may terminate this Agreement for "Cause," after giving Consultant written notice of the reason. Cause means: (1) Consultant has breached the provisions of this Agreement in any respect, or materially breached any other provision of this Agreement and the breach continues for 90 days following receipt of a notice from the Client; (2) Consultant has committed fraud, misappropriation, or embezzlement in connection with the Client's business; (3) Consultant has been convicted of a felony; or (4) Consultant's use of narcotics, liquor, or illicit drugs has a detrimental effect on the performance of his or her employment responsibilities, as determined by the Client. Further, either party may terminate this Agreement immediately upon the other party's cessation of business, election to dissolve, dissolution, insolvency, failure in business, commission of an act of bankruptcy, general assignment for the benefit of creditors or filing of any petition in bankruptcy or for the relief under the provisions of the bankruptcy laws. If this Agreement is terminated pursuant to this Section 12, Client shall only be liable for payment of consulting fees earned as a result of work actually performed and approved by Client and expenses actually incurred prior to the effective date of the termination.

Upon termination, Any equipment provided by the Client to the Consultant in connection with or furtherance of Consultant's services under this Agreement, including, but not limited to, computers, laptops, and personal management tools, shall, immediately upon the termination of this Agreement, be returned to the Client.

13. **FORCE MAJEURE**. Neither party hereto shall be liable for any loss, injury or damage out of any delay or failure of performance caused by circumstances beyond its reasonable control, or by circumstances which it could not through reasonable precaution have avoided including, but not limited to policies or restrictions of governments, wars, riots, or civil commotions (hereinafter referred to as a **"Force Majeure Event"**) and any such delay or failure of performance due to any said Force Majeure Event shall not be deemed to be a breach of or a default in the performance of this Agreement. The party prevented from performing because of a Force Majeure Event shall promptly notify the other party and shall do all things reasonably possible to remove such Force Majeure Event and, shall resume performance hereunder as soon as any such Force Majeure Event is at an end. Notwithstanding any other provisions of this Agreement, if delay in performance by either party exceeds thirty (30) days due to a Force Majeure Event, the non-delaying party may terminate this Agreement, immediately upon written notice to the delaying party, in which event all obligations and liabilities of the parties hereunder with respect to such future performance shall be discharged and terminated.

14. **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the internal laws (and not the laws of conflicts) of the State of Florida.

15. **NOTICES**. All notices under this Agreement shall be in writing and shall be given by email, personal delivery, or by registered or certified mail or overnight courier, return receipt requested, to the following addresses, or such other address as designated by written notice, and shall be deemed given upon receipt:

Client

Mirayint Cruise Management Ltd.
Attn: Vedat Ugurlu
Email: vedat@mirayint.com
Namik Kemal Cad.
Yetkili is merkezi No: 6
Mersin 10 Turkey
SLBT No: 869

Consultant

Fourneau International Limited
Attn: Mikael Petterson
Email: mikepetterson@yahoo.com
40 Silicone Avenue
Cyber City 77201, Ebene, Mauritius

16. **DISPUTE RESOLUTION.** If there is any dispute or controversy between the parties arising out of or relating to this Agreement, the parties agree that such dispute or controversy will be arbitrated in accordance with proceedings under American Arbitration Association rules, and such arbitration will be the exclusive dispute resolution method under this Agreement. The decision and award determined by such arbitration will be final and binding upon both parties. All costs and expenses, including reasonable attorney's fees and expert's fees, of all parties incurred in any dispute that is determined and/or settled by arbitration pursuant to this Agreement will be borne by the party determined to be liable in respect of such dispute; provided, however, that if complete liability is not assessed against only one party, the parties will share the total costs in proportion to their respective amounts of liability so determined. Except where clearly prevented by the area in dispute, both parties agree to continue performing their respective obligations under this Agreement until the dispute is resolved.

17. **SEVERABILITY**. If any covenant or other provision of this Agreement is invalid, illegal or incapable of being enforced, by reason of any rule, law or public policy, all other conditions and provisions of this

Agreement shall, nevertheless, remain in full force and effect and no covenant or provision shall be deemed dependent upon any other covenant or provision unless so expressed herein; provided however, that the aggregate of all such provisions found to be invalid or unenforceable does not materially affect the benefits and obligations of all parties of this Agreement taken as a whole.

**18. ASSIGNMENT**. Neither this Agreement nor any right conferred hereby is assignable by any party, whether in whole or in part, without the prior written consent of the other party; provided however, that Client shall have the right to assign this Agreement, whether in whole or in part, to any of its parent, subsidiary or affiliated companies. Consultant's duties hereunder are non-delegable and may not be subcontracted or otherwise delegated without the prior written consent of Client.

**19. MODIFICATION.** No modification, termination, or attempted waiver of this Agreement, or any provision thereof, shall be valid unless in writing signed by the party against whom the same is sought to be enforced.

**20. COMPLETE AGREEMENT.** This Agreement constitutes the complete agreement and sets forth the entire understanding and agreement of the parties as to the subject matter of this Agreement and supersedes all prior discussions and understandings in respect to the subject of this Agreement, whether written or oral.

**IN WITNESS WHEREOF**, this Agreement is executed as of the date set forth above.

| **Mirayint Cruise Management Ltd.** | **Fourneau International Limited** |
|---|---|
| By: VEDAT UGURLU | By: Mikael Petterson |
| Signed: | Signed: |
| | By: Irina Strembitsky |
| | Signed: |

## EXHIBIT A

Scope of Work

The Consultant will consist primarily of a team including Irina Strembitsky, and Mikael Petterson, both who have the necessary qualifications, experience and abilities to provide services to the Client. The Consultant will be responsible for creating and developing a 3 Year Residential World Cruise for the upper contemporary market. The Consultant will create selling materials, CRM, Website and upon approval of Client, will structure a sales team to target the American market. The Scope of Work will be as follows:

Irina Strembitsky

- Serve as head of Sales & Marketing
- Develop a Product offering specifically for a 3 Year World Cruise Residence targeting the American market.
- Create marketing channels and strategic partners
- Build a sales team to handle call volume, and internet chat
- Work out communication channels with customers such as phone, email and promotional in-person events.
- Build website materials, CRM and reservation system as needed
- Manage PR campaign with industry leaders
- Refine product offering with finance and operations
- Target USA Market through existing and new channels
- Other work related to Sales as defined by management

Mikael Petterson

- Serve as Managing Director of US Operations
- Establish the US headquarters
- Negotiate with other Partners for lot sale
- Structure Strategy and implementation efforts
- Develop financial model and analytics
- Manage cash flow, and closely monitor pre-launch expenses
- Itinerary planning in agreement with Owner and Irina
- Liaison with vessel owner on operational needs
- Develop onboard product and strategic partners
- Work closely with Irina in all facets of execution

The Services will also include any other tasks which the parties may agree on.

The Client and Consultant will work together to strategically develop the inaugural sailing date. An agreed upon timeline will be developed between Client and Consultant for targeted dates.

The Consultant and Client agree to the first sales of the residences will take place as soon as the necessary information has been agreed upon, and the product / brand outlined in such way to take to market

**Communication and Channel of Communication**

The Client will stipulate to the Consultant who the direct channel of persons or departments need to be communicated with, and that from both parties, any other communications by any other person may or will be copied into the approved channels.

**Operational Information**

The Client agrees to provide the Consultant with any and all information on the vessel, its operational costs, faults and registry and technical data, and any other information required, to ensure the Consultant can perform the tasks set forth in this agreement. The Consultant agrees to communicate the Client any and all policies, procedures, operational manuals and planning material to the Client in stages of completion.

**Reports**

Consultant shall periodically provide the Client with written reports of its observations and conclusions regarding the consulting services. Upon the termination of this Agreement, Consultant shall, upon the request of Client, prepare a final report of Consultant's activities.

# EXHIBIT B

## "Travel Policy"

Consultant and Client shall discuss and agree upon the most cost-efficient travel arrangements, prior to undertaking each individual planned trip, considering the cost of airfares, land transport, hotel, accommodation and heavy luggage costs.

Client has the option to purchase airfares, land transport, and accommodation on behalf of the Consultant or its employees engaged to perform Services, in which accommodations concerning air carrier, type of lodging or classification of automobile, unless prior written approval is received from authorized personnel in Client's Travel Department and attached to the final invoice.

Client does not pay expenses for family members or partners on business trips.

**Exchange Rates**

The exchange rate to be used for approved expenses on a personal credit card or cash transactions is the actual rate paid on the date of purchase

**Expense Types**

a. **AIR / RAIL TRAVEL –** Consultant will only be reimbursed for economy/coach class, unless otherwise approved by authorized personnel in Client's Travel Department. Consultant will be reimbursed for baggage fees. Fees for upgrades, extra legroom exit row seats, or early seat assignments will not be reimbursed, Personal air travel in conjunction with business travel will not be reimbursed. Charges for in-flight Wi-Fi, entertainment, meals, and beverages are not eligible for reimbursement.

b. **AIRPORT PARKING –** Parking expenses should be minimized. Long-term airport parking must be used whenever the vehicle will be left for more than 24 hours. The cost of parking versus the use of a taxi or shuttle services should be compared and the less expensive option used. Lost ticket charges are not eligible for reimbursement.

c. **CAR RENTALS -** Car transportation should be used only when it is either the most economical means of travel, or necessary due to the nature of the trip. Consider the cost of taxi, shuttle service or ride sharing service before requesting a rental car. It is reimbursed by car rental upgrades and navigation unit rentals will not In the United States, an intermediate size car should be rented. A full size (next level up from intermediate) may be rented for group travel (a party of three or more people) and should be detailed on the expense report form. Outside the United States, a compact class car should be rented. An upgrade to intermediate size can be used for parties of 3 or more. Approval by the authorized personnel in Client's Travel Department must be attached to the final invoice. Damage and/or repairs to cars, parking or traffic violations and towing charges will not be reimbursed.

d. **CAR RENTAL INSURANCE –** Consultant is not covered under Client's insurance and must purchase additional car rental insurance.

e. **TAXI –** The use of Taxi's is permitted when public transportation, airport shuttle, and/or hotel courtesy transportation is not available or when time or other factors make it impracticable to use available public conveyances. A receipt must support all taxi fares claimed on the invoice. Taxi receipts must indicate destination and date of travel. Taxi gratuities should not exceed 15% of the taxi fare in the United States or in regions of the world where customary.

f. **RIDE SHARING / CAR-HAILING SERVICES** – The used of services such as Uber, Lyft, or Grab, etc. is permitted in standard service category. (XL service category may be reimbursed for groups of three or more people.) Luxury service category will not be reimbursed.

Use of other chauffeured services (cars, SUV's limousines, etc.) will not be reimbursed.

g. **PERSONAL / COMPANY CAR** – Consultants who use their personal or any company car to conduct business on Client's behalf can be reimbursed mileage. Any expense report and a printed map route must be submitted detailing the miles driven and purpose of the trip. Damage and/or repairs to the car, traffic violations, parking tickets or towing charges will not be reimbursed, even if these costs result from a business trip. Personal car and/or Consultant's insurance applies it is Consultant's responsibility to obtain and maintain appropriate levels of car insurance. Client will not reimburse for any auto insurance costs. Reasonable financial discretion should be used when driving versus purchasing airfare related to long distance trips.

h. **TOLLS** – Consultant will be responsible for payment of tolls at the time of travel. Tolls paid while on Client business will be reimbursed with submission of original receipts or statements from pre-paid electronic toll collection programs showing date of collection. Tolls paid by a device issued in conjunction with a car rental will be included in the total cost of the rental and should be included on the final invoice submitted for reimbursement. If supplier decides to use its personal electronic toll collection devises in a rental unit, it is Consultant's responsibility to ensure terms of use are followed. Client is not responsible for any penalties assessed due to improper usage, loss, theft, or damage to electronic devices and penalties will not be reimbursed.

i. **ACCOMMODATION** – Accommodation during service execution will be offered based on availability. When a hotel say is required, reservations should be made through the Client's Travel Department, when possible. In the event this is not possible, rooms at the lowest available contracted rate should be reserved. Client will reimburse Consultant only for hotels for the time necessary to perform business for Client. In room movies, mini bar amenities, gift chops, spa, and other services will not be reimbursed.

j. **MEALS** – Meal costs are reimbursable expenses when travelling on business for Client's project. All expenses for meals will be judged on their reasonableness, as for cost, location, and circumstances.

k. **TELEPHONE / INTERNET** – Consultant should use the least expensive mode of communication available and avoid calls from a hotel room airplane, and/or ship. Complimentary Wi-Fi in hotels should be used where available. If complementary Wi-Fi is not available, Client will not reimburse for Wi-Fi access. When onboard Client's vessels, Consultant should work with Client's IT Team to secure shipboard Wi-Fi.

l. **ONBOARD EXPENSES** – Client will not reimburse for expenses of a personal nature. Personal expenses include, but are not limited to the following:

- ☐ Beauty salon;
- ☐ Spa products and/or services;
- ☐ Gift shop purchases;
- ☐ Shore excursions;
- ☐ Gratuities;
- ☐ Excessive ship-to-shore telephone calls;
- ☐ Personal internet / Wi-Fi access;
- ☐ Laundry
- ☐ Medical

- Anything from the stateroom mini fridge
- Crew Bar

m. **OTHER EXPENSES –** Expenses that might be construed to be business related but are not reimbursed include, but are not limited to, some of the following:

- Cell phone, cell phone monthly bills, car phones, accessories such as batteries, leather cases, customized ring tones, etc.;
- Credit card fees or interest;
- Internet connection from home;
- Items lost or stolen while traveling;
- Loss or damage to personal property;
- Passport costs;
- Global Entry Passes or similar international expedited passport screening pass;
- Visas Exception: if the selected travel location has a mandate for a Visa;
- Personal items used in business travel such as luggage, toiletries and non-business-related items;
- Reading materials; rental car extras such as navigation systems, satellite radio, etc.;
- Souvenirs purchased at ports of call;
- ATM withdrawals or overdraft fees;
- Chase exchange rate fees; and
- Liability insurance

n. **INVOICING** – Expenses invoiced and submitted to Client for payment must include the following information:

- Consultant Name and title;
- Travel location and dates
- Copies of all receipts

Final invoices must be submitted in English and converted to the currency as designated at the time of Agreement signing.

o. **RECEIPTS** – Regardless of cost, all expenditures require a copy of the itemized original receipt if invoiced. Credit card statements are not accepted. Receipts must include the date and place expenditure was incurred. Failure to provide the requested backup documentation will result in delayed payment or rejection of charges.

# EXHIBIT "B"

# Life at Sea Cruises

**Mikael** Petterson <mikepetterson@yahoo.com>
Címzett Olavs Zvinelis CEO; Victoria Cruises

Válasz | Válasz mindenkinek | Továbbítás | ...

Szo 2023. 03. 04. 1:59

Az üzenetre válaszolt: 2023. 03. 07. 15:25.

Olavs/Marcell

As you can probably see, we launched LifeatSeacruises.com on Wednesday and without another lead already have the leads to sell out by the end of the month. We actually have enough leads to fill our ship and yours, let me know if you want to discuss a potential solution. Obviously, we cant do 3% at this point given our marketing spend. but a 10% number is not out of the question. we are already out of balconies and could send them your way...

Best regards,
Mikael

# EXHIBIT "C"

**COMPOSITE EXHIBIT A**



# SALES COMMISSION AGREEMENT

This Sales Commission Agreement (the "Agreement") is made and entered into on 2023-05-10, by and between Life at Sea Cruises, a Florida corporation with its principal place of business at 500 East Broward Boulevard, Suite 1710. Ft. Lauderdale, Florida, USA (the "Company"), and Holger (Mark) Doerr, an individual with an address at 315 NE 3rd Ave #1807 Fort Lauderdale, FL 33301 (the "Sales Agent").

**WHEREAS**, the Company desires to engage the Sales Agent to sell the Company's product (the "Product") on a commission basis; and

**WHEREAS**, the Sales Agent desires to sell the Products on behalf of the Company and to earn a commission based on the sales made.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

**Commission.** The Sales Agent shall receive a commission equal to 2% of the net sales price of the Products sold by the Sales Agent. The commission shall be paid to the Sales Agent upon the Company's receipt of the first milestone payment, which is scheduled for May 31st, 2023, subject to the terms and conditions of this Agreement.

**Draw.** The Sales Agent will receive a draw against their commission. The amount of the draw shall be based on the Sales Agent's performance.

- The draw shall be paid on the 15th day of the month following the end of the Draw Period.

**Expenses.** The Sales Agent shall be solely responsible for all expenses incurred in connection with the sales of the Products, including but not limited to travel, lodging, and meals.

M.D.

**Non-Exclusive Appointment.** The appointment of the Sales Agent under this Agreement is non-exclusive, and the Company reserves the right to sell the Products directly to customers within the Territory or through other Sales Agents or channels.

**Term and Termination.** This Agreement shall commence on March 1, 2023 and shall continue until terminated by either party upon 10 days' written notice. In the event of termination, the Sales Agent shall be entitled to receive commissions on sales made prior to the date of termination.

**Confidentiality.** The Sales Agent shall keep all confidential and proprietary information of the Company, including but not limited to customer lists, pricing information, and product specifications, confidential and shall not disclose such information to any third party without the Company's prior written consent.

**Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its conflict of laws provisions.

**Entire Agreement.** This Agreement contains the entire understanding between the parties and supersedes all prior negotiations, understandings, and agreements between them, whether written or oral. No modification or amendment of this Agreement shall be effective unless in writing and signed by both parties.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**Life at Sea Cruises**

By: ______________________________

Name: Angela Miclat

Title: Director of Human Resources

**Sales Agent**

By: Mark Doerr ______________________________

Name: Full Legal Name ______________________________

Title: Sales Advisor ______________________________

# Signature Certificate

MIJW2-OHKFK-GLC8K-WTUCG

| Signer | Timestamp | Signature |
|---|---|---|
| **Angela Miclat**<br>Email: angela@lifeatseacruises.com<br>Shared via link | | |
| Sent: | 10 May 2023 19:29:06 UTC | |
| Viewed: | 10 May 2023 19:29:26 UTC | |
| Signed: | 10 May 2023 19:29:45 UTC | IP address: 120.29.76.210<br>Location: Angeles City, Philippines |
| **Mark Doerr**<br>Email: mark@lifeatseacruises.com<br>Shared via link | | Mark Doerr |
| Sent: | 10 May 2023 19:29:06 UTC | IP address: 172.58.128.16 |
| Viewed: | 10 May 2023 19:35:50 UTC | Location: Miami, United States |
| Signed: | 10 May 2023 19:37:39 UTC | |

10 May 2023 19:37:39 UTC



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.

# SALES COMMISSION AGREEMENT

This Sales Commission Agreement (the "Agreement") was made and entered into on March 1, 2023, by and between Life at Sea Cruises, a Florida corporation with its principal place of business at 500 East Broward Boulevard, Suite 1710. Ft. Lauderdale, Florida, USA (the "Company"), and Kathryn Villalba, an individual with an address at 12266 NW 10th Street Pembroke Pines, FL 33026 (the "Sales Agent").

**WHEREAS**, the Company desires to engage the Sales Agent to sell the Company's product (the "Product") on a commission basis; and

**WHEREAS,** the Sales Agent desires to sell the Products on behalf of the Company and to earn a commission based on the sales made.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

**Appointment.** The Company hereby appoints the Sales Agent as an independent Sales Agent to sell the Product to customers within the territory specified in Exhibit A attached hereto (the "Territory"). The Sales Agent accepts the appointment and agrees to use his or her best efforts to promote and sell the Products within the Territory.

**Commission.** The Sales Agent shall receive a commission equal to [insert percentage] of the net sales price of the Products sold by the Sales Agent within the Territory. The commission shall be paid to the Sales Agent within [insert number] days after the end of each calendar month.

**Expenses.** The Sales Agent shall be solely responsible for all expenses incurred in connection with the sales of the Products, including but not limited to travel, lodging, and meals.

K.V.

**Non-Exclusive Appointment.** The appointment of the Sales Agent under this Agreement is non-exclusive, and the Company reserves the right to sell the Products directly to customers within the Territory or through other Sales Agents or channels.

**Term and Termination.** This Agreement shall commence on February 16, 2023 and shall continue until terminated by either party upon 10 days' written notice. In the event of termination, the Sales Agent shall be entitled to receive commissions on sales made prior to the date of termination.

**Confidentiality.** The Sales Agent shall keep all confidential and proprietary information of the Company, including but not limited to customer lists, pricing information, and product specifications, confidential and shall not disclose such information to any third party without the Company's prior written consent.

**Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its conflict of laws provisions.

**Entire Agreement.** This Agreement contains the entire understanding between the parties and supersedes all prior negotiations, understandings, and agreements between them, whether written or oral. No modification or amendment of this Agreement shall be effective unless in writing and signed by both parties.

K.V.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**Life at Sea Cruises**

Signature: Mike Petterson

Date: March 1, 2023

Name: Mike Petterson

Title: Managing Director

**Kathy Villalba**

Signature: Kathy Villalba

Date: March 1, 2023

Name: Kathryn Villalba

Job Title: Sales Agent

# EXHIBIT A

Compensation and HR Topic

Remuneration (All in USD)

a) **Start Date.** Mar 1, 2023
b) **End Date.** Indefinite
c) **Commission:** 2% commission on the total for each stateroom.
d) **Payment schedule:** Monthly, every 15th of the month

<u>Commission Examples:</u>

- Solo traveler that books an outside stateroom for $306,000 which includes a 15% solo discount. Your commission on this sale would be $6,120.

It is agreed that the compensation shall be paid every 15th of each month for that it was due in accordance with a payment procedure through our payroll platform.

Acceptance:

**Company Name**

Life at Sea Cruises

**Signature**

Kathy Villalba

Print Name

Kathy Villalba

**Title**

Sales Agent

**Date**

Mar 1, 2023

# SALES COMMISSION AGREEMENT

This Sales Commission Agreement (the "Agreement") is made and entered into on 2023-05-10, by and between Life at Sea Cruises, a Florida corporation with its principal place of business at 500 East Broward Boulevard, Suite 1710. Ft. Lauderdale, Florida, USA (the "Company"), and Anne Alms, an individual with an address at 6319 Horse Mill Pl, Palmetto, FL 34221 (the "Sales Agent").

**WHEREAS**, the Company desires to engage the Sales Agent to sell the Company's product (the "Product") on a commission basis; and

**WHEREAS**, the Sales Agent desires to sell the Products on behalf of the Company and to earn a commission based on the sales made.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

**Commission.** The Sales Agent shall receive a commission equal to 2% of the net sales price of the Products sold by the Sales Agent. The commission shall be paid to the Sales Agent upon the Company's receipt of the first milestone payment, which is scheduled for May 31st, 2023, subject to the terms and conditions of this Agreement.

**Draw.** The Sales Agent will receive a draw against their commission. The amount of the draw shall be based on the Sales Agent's performance.

- The draw shall be paid on the 15th day of the month following the end of the Draw Period.

**Expenses.** The Sales Agent shall be solely responsible for all expenses incurred in connection with the sales of the Products, including but not limited to travel, lodging, and meals.

A.A.

**Non-Exclusive Appointment.** The appointment of the Sales Agent under this Agreement is non-exclusive, and the Company reserves the right to sell the Products directly to customers within the Territory or through other Sales Agents or channels.

**Term and Termination.** This Agreement shall commence on March 1, 2023 and shall continue until terminated by either party upon 10 days' written notice. In the event of termination, the Sales Agent shall be entitled to receive commissions on sales made prior to the date of termination.

**Confidentiality.** The Sales Agent shall keep all confidential and proprietary information of the Company, including but not limited to customer lists, pricing information, and product specifications, confidential and shall not disclose such information to any third party without the Company's prior written consent.

**Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its conflict of laws provisions.

**Entire Agreement.** This Agreement contains the entire understanding between the parties and supersedes all prior negotiations, understandings, and agreements between them, whether written or oral. No modification or amendment of this Agreement shall be effective unless in writing and signed by both parties.

A.A.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**Life at Sea Cruises**

By: ____________________________

Name: Angela Miclat

Title: Director of Human Resources

**Sales Agent**

By: Anne Alves ____________________________

Name: Full Legal Name ____________________________

Title: Sales Advisor ____________________________

# Signature Certificate

DECQW-BYOGG-G8EQC-OLC9J

| Signer | Timestamp | Signature |
|---|---|---|
| **Angela Miclat**<br>Email: angela@lifeatseacruises.com<br>Shared via link<br>Sent:<br>Viewed:<br>Signed: | <br><br><br>10 May 2023 19:24:20 UTC<br>10 May 2023 19:25:27 UTC<br>10 May 2023 19:25:41 UTC | <br>IP address: 120.29.76.210<br>Location: Angeles City, Philippines |
| **Anne Alms**<br>Email: anne@lifeatseacruises.com<br>Shared via link<br>Sent:<br>Viewed:<br>Signed: | <br><br><br>10 May 2023 19:24:20 UTC<br>10 May 2023 19:26:06 UTC<br>10 May 2023 19:28:52 UTC | <br>IP address: 172.58.129.81<br>Location: Miami, United States |

10 May 2023 19:28:52 UTC

Page 1 of 1

**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.

# SALES COMMISSION AGREEMENT

This Sales Commission Agreement (the "Agreement") is made and entered into on 2023-05-10, by and between Life at Sea Cruises, a Florida corporation with its principal place of business at 500 East Broward Boulevard, Suite 1710. Ft. Lauderdale, Florida, USA (the "Company"), and Tobias Lindsten, an individual with an address at tobias@lifeatseacruises.com (the "Sales Agent").

**WHEREAS**, the Company desires to engage the Sales Agent to sell the Company's product (the "Product") on a commission basis; and

**WHEREAS**, the Sales Agent desires to sell the Products on behalf of the Company and to earn a commission based on the sales made.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

**Commission.** The Sales Agent shall receive a commission equal to 2% of the net sales price of the Products sold by the Sales Agent. The commission shall be paid to the Sales Agent upon the Company's receipt of the first milestone payment, which is scheduled for May 31st, 2023, subject to the terms and conditions of this Agreement.

**Draw.** The Sales Agent will receive a draw against their commission. The amount of the draw shall be based on the Sales Agent's performance.

- The draw shall be paid on the 15th day of the month following the end of the Draw Period.

**Expenses.** The Sales Agent shall be solely responsible for all expenses incurred in connection with the sales of the Products, including but not limited to travel, lodging, and meals.

T.L.

**Non-Exclusive Appointment.** The appointment of the Sales Agent under this Agreement is non-exclusive, and the Company reserves the right to sell the Products directly to customers within the Territory or through other Sales Agents or channels.

**Term and Termination.** This Agreement shall commence on March 1, 2023 and shall continue until terminated by either party upon 10 days' written notice. In the event of termination, the Sales Agent shall be entitled to receive commissions on sales made prior to the date of termination.

**Confidentiality.** The Sales Agent shall keep all confidential and proprietary information of the Company, including but not limited to customer lists, pricing information, and product specifications, confidential and shall not disclose such information to any third party without the Company's prior written consent.

**Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its conflict of laws provisions.

**Entire Agreement.** This Agreement contains the entire understanding between the parties and supersedes all prior negotiations, understandings, and agreements between them, whether written or oral. No modification or amendment of this Agreement shall be effective unless in writing and signed by both parties.

F.L.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**Life at Sea Cruises**

By: ______________________________

Name: Angela Miclat

Title: Director of Human Resources

**Sales Agent**

By: Tobias Lindsten

Name: Tobias Lindsten

Title: Sales Advisor

# Signature Certificate

5SGKM-4K5CS-TW8BH-C5T2B

| Signer | Timestamp | Signature |
|---|---|---|
| **Angela Miclat**<br>Email: angela@lifeatseacruises.com<br>Shared via link | |  |
| Sent: | 10 May 2023 19:26:53 UTC | |
| Viewed: | 10 May 2023 19:27:05 UTC | |
| Signed: | 10 May 2023 19:27:23 UTC | IP address: 120.29.76.210<br>Location: Angeles City, Philippines |
| **Tobias Lindsten**<br>Email: tobias@lifeatseacruises.com<br>Shared via link | | Tobias Lindsten |
| Sent: | 10 May 2023 19:26:53 UTC | |
| Viewed: | 10 May 2023 21:11:37 UTC | IP address: 78.70.134.136 |
| Signed: | 10 May 2023 21:13:34 UTC | Location: Falkenberg, Sweden |

10 May 2023 21:13:34 UTC

Page 1 of 1

**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.

# EXHIBIT "D"

# LIFE AT SEA CRUISES GUEST CONTRACT

It is mutually agreed between Miray Cruises, Ltd, registered in the Marshall Islands (offering and operating the Life at Sea Cruises product) and Guest as follows:

This Cruise Contract is issued by Miray Cruises, Ltd.

In consideration of the receipt of the cruise fare and/or boarding and lodging on the vessel, the booking of the cruise and the cruise are subject to the following terms and conditions:

## 1. DEFINITIONS

(a) "Agreement" or "Contract" means the terms and conditions set forth in this cruise Contract together with the Cruise Fare, owed for your Cruise. Together, the items described in the preceding sentence shall constitute an agreement between Passenger and Operator forthe Cruise.

(b) "Miray" shall mean and include the Vessel, and all its owners, operators, employees, agents, charterers, and water tenders. The term "Guest" shall include the plural where appropriate and means all persons or entities booking or purchasing passage and/or traveling under this Contract, including heirs, representatives, and any accompanying minors. The masculine includes the feminine. "Guest" shall have the same meaning as "Passenger" in this Contract. "Guest" or "You" or "Your" includes all persons traveling under this Cruise Contract, along with their respective heirs and representatives. Any Guest under the age of 18 must be identified to Miray at the time of booking and must be accompanied by an adult on the Cruise at all times. The adult who agrees to this contract also does so on behalf of any minor travelling with the adult and who is not competent to contract.

(c) "Cruise" includes the specific cruise covered by this Contract, as the same may be modified and shall include those periods in which the Guest has embarked or debarked the Vessel and while the Guest is on land while the Vessel is in port or at anchor.

(d) "Fare" means the Cruise Fare that is due for this cruise including such amounts that are still owed and/or have been paid by the Guest, but does not include the amounts due for other services such as air transportation, photographs, telephone calls, medical services beyond those that are included in the Fare, spirits, additional or upgraded wine, beer, or soft drinks beyond those included at meal times, shore excursions, salon and spa services, optional additional gratuities, or any other incidental charge or expense, nor does it include any security surcharges or similar assessments made by airlines, trains, buses, hotels, or other third parties which may be due and payable by Passenger upon request. All fares are quoted in U.S. Dollars and are based on double occupancy. A Service Gratuity is automatically included as part of the Cruise Fare, to recognize the efforts of our crew members who will be providing services to our Guest's onboard. Service Gratuities are pooled and distributed in the form of added wages, bonuses and/or crew benefits. A Service Charge will be automatically added to optional purchases for beverages, specialty dining or events when available, and other voluntary purchases during the cruise. If you choose to provide additional compensation directly to a crew member, you may do so at your own discretion.

(e) The Cruise Contract shall be deemed to be an acceptance by Guest, on behalf of himself and all other persons traveling under this Cruise Contract, and his and their heirs and representatives, that he and they accept and agree to all the terms and conditions herein. This ticket and subsequent embarkation on the Vessel is valid only for the person(s) named as Guests and any represented minors, and cannot be transferred or modified without the written consent of Miray, which shall not unreasonably withheld

(f) "Vessel" means a ship operated, chartered or providedby Miray on which the Guest will embark, or against which the Guest may have a claim as well as any substituted ship used in performance of this ticket. (g) "Master" includes the Captain or delegated subordinates on any Vessel provided by Miray on which the Guest is travelling.

## 2. DEPOSIT AND PAYMENT POLICY

Your deposit amount required to book a cabin will be provided to You at the time of booking. Bookings made within 60 days from sailing are required to be paid in fullunless a payment plan has been selected Payments shall be made as outlined on the proforma.

There will be a charge for single occupancy of 85% of the double occupancy suite or stateroom fare.

Bookings not paid as per the selected payment plan as attached will automatically be cancelled. After November 1, 2023 if payments are not made per this schedule, the Guest's reservation will be cancelled and Guest will be immediately disembarked. Miray reserves the right to cancel any bookingif not paid in accordance with the proforma. Passport details and special onboard service requestsmust be received no later than September 1, 2023. Payments may be made by credit card (Amex, Visa, Mastercard) or wire transfer. Payments made by credit card will incur an additional 3% credit card fee. Wire transfer fees will not be covered by Miray. Miray accepts no responsibility for foreign currency/transaction processing fees independently assessed by issuing banks. None of these fees separately charged by the issuingbanks accrues to the benefit of Miray. Third party credit card charges can only be accepted when accompanied by valid authorization to charge from the relevant card owner.

## 3. CHILDREN, INFANTS AND UNACCOMPANIED MINORS

Any Guest under the age of 18 must be accompanied by and occupy the same stateroom as an adult 18 years or older. Miray does not provide for the care, entertainment or supervision of children. Living onboard requirements is 16. Pregnant women who will be visiting guests must not be more than6 months pregnant at the time of visit.

## 4. GUEST ETIQUETTE AND CONSIDERATION

(a) Miray, its Masters, General Managers, Chief Pursers or any other deputized figures of authority on board the Vessel reserve the right, at their sole discretion, to disembark any guest, in any port of call, for any reason, should they be considered a nuisance to or danger to guests, staff or otherwise hinder or threaten the safe and secure operation of the Vessel or any associated land programs. Any guest(s) disembarked from the Vessel or associated land programs are solely responsible for any costs incurred with repatriation. The full cruise Fare will be considered earned and retained and no refunds or reimbursements will be given.

(b) Miray may deny boarding to any persons convicted of certain felonies, which include but are not limited to aggravated assault (including domestic violence), murder, robbery, sexual assault, and other felony sexual offenses. Miray reserves the right to access public records containing information about any felonious convictions as part of its guest screening, and to cancel a booking and/or deny embarkation at any time to any individual who has been convicted of any of the listed crimes. Guest hereby consents to Miray accessing public records concerning Guest regarding felonious conviction/s as part of its screening policy. In the event of such cancellation or denial the affected individual's sole remedy shall be a refund of the amount paid to Miray for that individual's own booking, without entitlementto any further damages, loss, expenses, credit, or compensation whatsoever. Any Guest travelling with the person who is denied boarding shall be unaffected and cancellation by any of these other Guests are subject to the standard cancellation polices.

## 5. RESERVATION MODIFICATIONS

Changes to a reservation after deposit and prior to issuance of travel documents may result in assessment of administrative fees and service charges beyond the control of Miray. Administrative fees and service charges will vary and are based on the type of change to your cruise departure, itinerary, hotel or land

package or air supplement. Guests are responsible for any additional costs incurred as a result of these changes and Miray will impose a change fee of $150 per person.Bookings cannot be converted from cruise only to air/sea within thirty (30) days of sailing. Some changes, including name changes, may also be considered cancellations and applicable fees will be assessed. Any changes to a reservation that result in imposition of airline or other cancellation fees are the responsibility of the guest. No refund will be made for unused or partially used portions of the cruise, air or land programs, including shore excursions, except as specifically outlined in the Guest Contract.

**6. PUBLIC HEALTH**

(a) Miray follows the guidance and directives of established health authorities in the U.S. and other destinations where the Vessel visits, including the CDC and other international, national, and local health agencies when the Vessel is within those agencies' jurisdiction. Passenger acknowledges that these directives may change from time to time and that Miray's COVID-19 Policies and Procedures may therefore change. Passenger expressly agrees to comply not only with the COVID-19 Policies and Procedures as they are described herein, but also as they are set forth on Miray's Life at Sea Cruises brand website at www.lifeatseacruises.com, at all times including pre-embarkation, while onboard, during port calls and shore excursions and/ or final disembarkation. In case of any conflict between the COVID-19 Policies and Procedures described herein or on Miray's Life at Sea Cruises brand website, the website shall govern. Guests must abide by Miray's COVID-19 Policies and Procedures.

(b) Miray highly recommends that Guests consult with a personal physician prior to embarkation and to review the U.S. Centers for Disease Control ("CDC") website for updated information. The CDC has identified elderly persons and persons with certain chronic medical conditions as being at increased risk of life-threatening complications from being infected with COVID-19. Passengers may be exposed to communicable illnesses, including but not limited to influenza, COVID-19, colds, and norovirus while onboard the Vessel as well as traveling to/from the Vessel, during shore excursions, in terminals, and during activities. Guest accepts that the exposure to communicable illnesses and other diseases is inherent in activities where individuals interact or share common facilities and is beyond the control of Miray. Under this Cruise Contract, the Guest knowingly and voluntarily accept these risks including the risk of serious illness or death resulting from such exposure, and/or all related damages, costs, expenses, and losses of any nature whatsoever.

(c) Upon embarkation and at any time during the Cruise, Miray may require that Guests provide a truthful and complete health questionnaire containing any and all health or travel related questions are required by Miray in its sole discretion. Miray may perform routine or periodic testing and temperature checks of each Guest. Miray reserves the right at any time to modify capacity rules for activities (including but not limited to restaurants, gyms, entertainment events, and shore excursions) in the event it determines that normal capacities may present unsafe exposure to Guests. If required to prevent illnesses onboard, Miray may require the mandatory use by each Passenger (except where a medical exemption is provided by the onboard Doctor), of face coverings in public locations outside of the Guest's cabin, during embarkation, disembarkation, and shore excursions. Miray also retains the right to confine a Guest to their cabin if they have been determined to be carrying a communicable disease or provide emergency disembarkation of the Guest, if in Miray's sole discretions, such steps are necessary to prevent or slow the spread of COVID-19.

(d) Any noncompliance by the Guest or Guest's travelling party with Miray's COVID-19 Policies and Procedures or this Ticket Contract, shall be grounds for refusal to embark, or reembark after going ashore, quarantine onboard the Vessel, reporting to government or health authorities, disembarkation, or other steps that are determined to be necessary in Miray's sole discretion under the applicable circumstances, to protect the wellbeing and health of others. Under these circumstances, Guest's shall not be entitled to a refund or entitled to compensation of any kind. Guest will be responsible for all related fines and costs, including without limitation, travel expenses and for necessary travel documentation required by any port, or for departure from or arrival to the Guest's country of residence. In no event, will Miray be liable for any damages or expenses whatsoever incurred by any Passenger, as a result of Miray's decision to refuse reboarding, quarantine, disembarkation, or any other decisions taken by Miray.

(e) If a Guest tests positive for COVID-19, influenza, or any other communicable disease while onboard, Miray, in its sole discretion may require the Guest to be quarantined in their cabin and may refuse disembarkation in any port to such Guest to preventthe spread of any communicable illness. If it is deemed necessary to disembark the Guest due to a COVID-19 infection that requires onshore medical treatment, and the Guest is unable to reboard the Vessel within 30 days, then the Guest will be entitled to a refund only for the unused portion of the cruise. Any expenses incurred by the Guest including related costs, fines, and travel expenses are the sole responsibility of the Guest and under no circumstances will be the responsibility of Miray.

**7. MEDICAL SERVICES**

(a) Each Vessel is equipped with limited medical facilities and staffed by internationally accredited medical personnel who are independent contractors as Miray is not a medical provider. Any interactions with medical providers in port or onboard are done so at the sole risk and cost (beyond standard medical visits) of the Guest and provided for the convenience of the Guest, work directly for the Guest, and are not acting under the supervision or control of Miray. Although standard medical visits and medical evaluations are included in the cruise fare, customary Emergency Room fees, medications, procedures, and charges may apply for medical services and are dictated by the services performed by the medical staff. Guest acknowledges that medical care and medical evacuation may not always be available in port or while at sea. Miray assumes no liability for treatment, failure to treat, misdiagnoses, diagnosis, any alleged or actual malpractice, examinations, advice, or other services provided by the medicalstaff. Complimentary medical visits include standard visits necessary if the Guest is feeling unwell or has been injured. Routine care or necessary ongoing medical visits beyond the standard visits will be charged an additional fee. Miray recommends that Guest obtains medical insurance to cover these types of additional expenses.

(b) Guests needing special services during the voyage, or needing to travel with any medical apparatus', including wheelchairs, motorized scooters, etc., must advise Miray in writing at time of deposit. Please note some ports of call may not be suitable for guests with limited mobility and in such cases, may preclude debarkation for any individual with limited mobility, with or without the aid of a wheelchair or motorized scooter. Miray has the right to refuse or revoke passage to anyone who, in its judgment, is in a physical, mental or emotional condition unfit for travel or whose comfort on board may be compromised due to situations beyond the care that can be provided by Miray. Miray does not offer medical insurance and any medical procedures or medications required in addition to the standard health visit will be at cost.

**8. ONBOARD ACCOUNT STATUS**

Guests are required to keep their onboard account balances positive at all times.Miray reserves the right to deny boarding and resell cabins that remain in default for 30 days.

**9. NOTICE TO BOARD**

If guests disembark for more than 2 weeks, guests must notify Guest services at least 2 weeks prior to rejoining the vessel. If a shorter disembarkation or embarkation period becomes required, Miray will make all efforts to accommodate the request but it is not guaranteed.

**10. FRIENDS & FAMILY**

**FRIENDS & FAMILY**

Friends & Family space is limited onboard and must be planned and approved by guest services at least 2 weeks ahead of arrival. Port Taxes, gratuities, food and amenities charge of $33 per person per day, will be charged to the Stateroom prior to embarkation. You must have the space in your cabin to accommodate guests at no additional charge (other than the aforementioned $33 per person per day).Other Friends & Family cabins are available on a first come first served basis and are charged a daily rate depending on cabin type. All Guests may "opt-in" or "opt-out" of Friends & Family. If a Guest chooses to opt-out, then only friends and family may be accommodated within their cabin and as such, if the Guest disembarks the vessel for a period of time longer than two weeks, then their cabin will not be used for other passenger Friends & Family. If a Guest chooses to opt-in to Friends & Family, then they will be able to request additional cabins,

where available for Friends & Family, and they will also consent to allowing other passenger Friends & Family to stay in their cabin if they disembark for more than two weeks with notice.

**11. DEVIATION, CANCELLATION, AND REFUND**

(a) If the inaugural sail date is delayed for any reason other than reasons that fall within the reasons listed below, then for passengers embarking in Istanbul, Miray will cover the cost of room and board for up to 30 days. If the inaugural sail date is delayed by more than 30 days, then Miray will refund the full Cruise Fare that has been paid. The Vessel shall be entitled to leave and enter ports at the Master's discretion and for any purpose and to omit or change any or all ports of call, arrival or departure times, with or without notice, for any reason whatsoever, including but not limited to health and safety, security, adverse weather, hurricanes, tornadoes, strikes, tides, hostilities, civil unrest, port closings, emergency debarkations of Guests or crew, late air, sea, car or motor coach departures or arrivals, mechanical breakdowns, declared pandemics, public health emergencies, outbreak of communicable disease, quarantines, national or regional emergencies, US or foreign governmental advisories or travel warnings, all such deviations being considered as forming part of and included in the proposed voyage.

(b) If the cruise is cancelled by Miray for any reason, Miray shall thereupon return to the Guest, if the Contract is completely canceled, a full refund of the Cruise Fare or, if the Contact is partially canceled, a proportionate part thereof. Under such circumstances, Miray shall have no further liability for damages or compensation of any kind. In the event a voyage is terminated early due or cancelled to mechanical failure of the Vessel, Guest is entitled to their Cruise Fare, or a proportionate share thereof, in addition to transportation to the Vessel's next scheduled port of disembarkation or Guest's home city, at Miray's discretion and expense, as well as necessary lodging at the unscheduled port of disembarkation, if required, at Miray's expense.

(c) In the event a voyage is terminated early or cancelled due to mechanical failure of the Vessel and a replacement vessel is not provided, Guest is entitled to their Cruise Fare (if cancelled prior to the first day of the voyage), or a proportionate share thereof, in addition to transportation to the Vessel's scheduled port of disembarkation or Guest's home city, at Miray's discretion and expense, as well as necessary lodging at the unscheduled port of disembarkation, if required, at Miray's expense.

(d) The Vessel may deviate from its scheduled course to assist other vessels for the purposes of saving life or property without liability whatsoever to Guest.

(e) All cancellations requested by Guests must be in writing and received by Miray no later than the day before cancellation penalties are to be assessed. Fare is defined as the full cost of any cruise or air component purchased from Miray, excluding optional facilities and services fees. Any service fees, exchange rate differences, wire transfer fees, etc. wll not be reimbursed by Miray.

(f) If a guest has a qualified medical event and it is determined by the ship's Dr. as well as a public shoreside Dr. that the guest is unable to return for 30 days or more, then Miray will reimburse guest for the period of time that the guest is unable to be onboard. Both the shoreside Dr. as well as the ship's Dr. after review of Guest's documentation on the qualified medical event must both agree that Guest is cleared to return back to the ship and continue the voyage. If the Guest, after 30 days, is unable to continue the voyage after the medical event, the remaining portion of the voyage will be refunded to guest in full.

The following cancellation charges will be assessed for all written cancellations received up to the scheduled time of departure.

Guests who wish to cancel their reservation prior to embarkation on the Vessel, may do so in writing to Miray and will be subject to the following cancellation charges:

| | |
|---|---|
| Cancellations between July 16 – July 31, 2023 | 50% of the total amount paid will be refunded |
| Cancellations between August 1 – August 31, 2023 | 25% of the total amount paid will be refunded |
| Cancellations between September 1 – October 30, 2023 | 10% of the total amount paid will be refunded |

Any credit card fees or wire transfer fees incurred will not be refunded if cancelled.

**12. VESSEL**

Miray retains the right to change or modify the vessel provided for its voyagesat any time and will ensure that a vessel of equal or greater quality will be provided.

**13. RESPONSIBILITY AND COMPLIANCE**

(a) Guests specifically release Miray from any and allclaims for loss or damage to baggage or property or from personal injuries or death, or from loss or delay arising out the acts, omissions or negligence of any independent contractors, such as air carriers, hotels, shore excursion operations, restaurateurs, transportation providers, medical personnel, spa personnel, or other providers of services or facilities onboard the Vessel or onshore at any port of call. All arrangements made with independent contractors are made solely for the convenience of guestsand are done at the guests' own risk. Miray specifically disclaims all liabilities for damages for emotional distress, mental suffering or psychological injury of any kind. Tickets, vouchers and any other travel documents are subject to all terms and conditions of the respective suppliers, some of which may limit a supplier's liability.

(b) Guests shall at all times comply with the provisions of this Agreement, with all applicable laws, and with all of Miray's policies, procedures, and requirements (which may be changed from time to time without notice). While onboard, Guests may not enter any designated crew areas, including any crew quarters, under any circumstances. Additionally, Guests may not sell, advertise, promote, any products or services to other Guests onboard any of Miray's Vessels. Any Guests who wish to provide a service must be approved by Miray, carry their own liability insurance, and a separate agreement and waiver will apply between the Guest providing the service, and the Guest to whom theservice is being provided. Such waiver must fully release Miray of any connection to and fully hold Miray harmless from any wrongdoing

(c) Miray retains the right to enter any Guest room even when the "Do Not Disturb" sign is out for any required emergency maintenance, safety, or security. Where there is not an emergency situation, Miray will make an attempt to schedule a time that is acceptable to both the Guest and to the Miray maintenance team.

(d) Except as otherwise expressly provided herein, Miray shall not be liable for any injury, death, illness, damage, delay or other loss to person or property, or any other claim by any guest caused by an act of god, war, terrorism, civil commotion, labor trouble, government interference, perils of the sea, fire, orders by government agencies restricting travel due to declared pandemics, public health emergencies or outbreaks of communicable disease, covid-19, influenza, colds and norovirus, quarantines, national or regional emergencies, thefts or any other cause beyond carrier's reasonable control, or any act not shown to be caused by Miray's negligence.

(e) Guest agrees to solely assume the risk of injury, death, illness or other loss, and Miray is not responsible for guest's use of any athletic or recreational equipment; or for the negligence or wrongdoing of any independent contractors, including but not limited to photographers, spa personnel or entertainers; or for events taking place off Miray's vessels, launches, tenders, or transports, or as part of any shore excursion, tour or activity.

(f) Miray hereby disclaims all liability to the guest for damages for emotional distress, mental suffering or psychological injury of any kind under any circumstances, when such damages were neither the result of a physical injury to the guest, nor the result of guest having been at actual risk of physical injury, nor were intentionally inflicted by Miray. Without limiting the preceding sentence, in no event will Miray be liable to guest for any consequential, incidental, exemplary or punitive damages.

(g) Passengers embarking the cruise in a European member state port are afforded rights under EU regulation 1177/2010. For a copy of EU Regulation 392/2009, visit https://eur-lex.europa.eu/legalcontent/en/txt/pdf/?uri=celex:32009r0392&from=en. For a copy of the Athens convention and the 2002 protocol thereto, visithttps://treaties.un.org/doc/publication/unts/volume%201463/volume- 1463-i-24817- english.pdf and

https://treaties.un.org/doc/publication/unts/no%20volume/24817/a24817 080000028053bf55.pdf (full text in English begins at page 40).

As to all other cruises not described above, all the restrictions, exemptions from, and limitations of liability provided in, or authorized by the laws of the united states shall apply, including but not limited to, title46 of the united States code §§30501 through 30509, and 30511.

(h) Except as otherwise expressly set forth herein, this ticket contract and all disputes or claims whatsoever by guest arising from or related to this ticket contract shall in all respects andwithout regard to conflict of law principles, be governed by and construed in accordance with the general maritime law of the United states of America, and, when applicable, the U.S. Death on the High Seas Act (46 U.S.C. § 30301 et seq.). Except as otherwise expressly specified in this ticket, guest agrees this choice of law supersedes and preempts any provision of law of any other state or nation.

(i) No suit shall be maintainable against Miray or the Vessel upon any claim relating to the damage or loss to any property unless the guest provides a written notice of the claim, with full details, which shall be delivered to Miray at its Life at Sea Cruises office located at 500 E. Broward Blvd., Suite 1710, Fort Lauderdale, FL 33394 within thirty (30) days afer termination of the voyage to which this cruise contract relates or during the cruise onboard to the general manager's attention and acknowledgement of receipt has been received by the guest from the onboard representative; and in no event shall any suit for any cause against Miray or the vessel with respect to loss of or damage to property be maintainable unless suit shall be filed within one year after the termination of the voyage and process has been served within one hundred twenty days after filing, notwithstanding any provision of law of any state, territory, possession or country to the contrary.

(j) It is agreed by and between guest and carrier that all claims, disputes and matters whatsoever arising under, arising out of, or relating to this cruise contract shall be litigated in and before a court of competent jurisdiction located in Brevard county,Florida, U.S.A., or the United States District Court, Middle District of Florida, Orlando division. This cruise contract provides for the exclusive resolution of disputes through individual legal action on guest's own behalf instead of through any class action. Even if the applicable law provides otherwise, guest agrees that any lawsuit against carrier whatsoever shall be litigated by the guest individually and not as a member of any class or as part of a class action, and the guest expressly agrees to waive any law entitling guest to participate in a class action.

(k) Either party shall hold the other harmless against any and all claims, demands, damages, liabilities and costs incurred which directly or indirectly result from, or arise in connection with, any negligent act or omission, pertaining to its activities and obligations under this Agreement.

(l) All protections, benefits, defenses, and exclusions from and limitations of liability in favor of Miray set forth in this cruise contract shall also ensurefor the benefit of all of Miray Cruises Ltd. subsidiaries and affiliated or related companies, including but not limited to Life at Sea Cruises, Inc.,Miray Cruises, LLC, Mirayint Cruise Management Ltd, Miray Cruises and Management, LLC, the Vessel owner,lessor(s), sub-lessor(s), charterer(s), bare boat charterer(s), other charterer(s), operator, agents or manager, and also including Miray's contractors and suppliers of goods and services, including but not limited to concessionaires, medical staff, all shore excursion and/or tour operators, and independent contractors.

**14. INSURANCE**

Adequate personal and trip cancellation insurance is highly recommended to cover the full purchase price of the cruise, including air and/or land program costs. All trip cancellation policies will be strictly enforced. No refund will be made for unused or partially used portions of the cruise, air or land programs, including shore excursions, except as specifically outlined in thein Section 11 and Section 12.

**15. INDEPENDENT TRAVEL ARRANGEMENTS**

Miray has no responsibility regarding air or land travel arrangements made by nonrefundable, restricted travel or frequent flyer tickets. This exclusion of liability includes consequences to independently arranged

air or land travel that may result from last minute changes in the embarkation or debarkation ports, and delays in arrival at any airport or port location.

**16. BAGGAGE POLICY**

Luggage for Miray's guests must be handled pursuant to regulations and tariffs of airlines, government security requirements and ground operators. Luggage exceeding these limitations will be subject to charges as set forth by the individual operators, including any excess baggage charges. Fees for checked luggage are now common and are the responsibility ofthe guest. Please check with your specific airline(s) for their respective luggage policy. Miray reserves the right to refuse any items that may be considered dangerous (explosives, firearms, liquid oxygen, combustible, or illegal items). Miray reserves the right to search any baggage for security reasons. All hand-carried luggage and personal effects are the responsibility of the guest at all times. Miray is not responsible for the loss of or damage to guests' luggage. Baggage insurance is recommended. Luggage and personal belongings will be taken off the vessel upon guest debarkation. Under no circumstances will luggage be kept on board without the owner of such luggage being on the vessel after the completion of the 3 year cruise. Guests may bring a reasonable amount of luggage on board a Miray vessel. No baggage or items heavier than 70lbs will be loaded onto or offloaded from our vessels.

**17. POD**

PODs will be provided to each Guest whose up to date payment has been received and delivery is tentatively scheduled for August 31st. For guests who book after August 31, 2023, PODs will not be provided and guests will be responsible for bringing their own luggage to the vessel. US Continental guests will have PODs sent to their house and transferred to Miami for embarkation. Guests living in continental Europe or Asia, will have their PODs sent to Istanbul for embarkation. Any other guests who do not fall under these parameters, guest is responsible for shipping/freight charges over $500. PODs will be shipped through ground transportation and may take up to 2 weeks from pick-up. At the completion of the cruise, Miray will deliver the PODs to the Continental US, Europe or Asia within two weeks. However, Miray is not responsible for shipping delays. Guests will be responsible for any charges above $500 in freight. Dimensions are the size of a double standard closet. Miray is not responsible for storage for items that cannot fit within your cabin. POD are a means to transport your belongings to the vessel. Please only bring items that you absolutely need and that will fit within your cabin.

**18. STORAGE**

The Vessel has a limited amount of storage space for bulky recreational equipment at the cost of $100 per month on a first come first served basis. Guests who wish to store such items must notify Miray prior to boarding and receive approval which shall not be unreasonably withheld. There will not be storage space for personal items, motorized or other vehicles, other equipment, instruments, or any personal items of residence. Any such items should be stored in your cabin. Accessories should be foldable to allow for space within the cabin.

**19. DOCUMENTATION AND VISAS**

Passport and Visa requirements, and regulations regarding vaccination certificates and other health requirements vary by destination. It is the sole responsibility of each guest to obtain and have available the appropriate valid travel and health documents for their chosen itinerary. Any guest traveling without the proper documentation will not be allowed to board the vessel and no refund of cruise fare or any other travel components purchased from Miray will be issued. Passports must be valid throughout the duration of the cruise plus three months following the date of the trip completion. Guests of residence must have passports valid for three months following their disembarkation date. Miray accepts no responsibility for obtaining required visas nor for advising guests of visa or other immigration requirements beyond the guidelines indicated.

**20. ATTIRE**

Recommended onboard attire is resort or country club casual. For evening dining, elegant casual resort wear is suggested. Miray does not provide clothing for colder weather.

**21. BOARDING**

Guests are required to be on board the vessel at least one hour prior to the scheduled departure time. Should the (in)actions of any guest(s) result in the vessel not sailing at its scheduled departure time, Miray shall assess Late Departure Fees beginning at $1,000 per guest, to said guest(s) directly responsible for any departure that is delayed more than 15 minutes beyond the scheduled and published departure time, to cover the costs levied against Miray by port authorities, governmental and quasi-governmental agencies as agreed and liquidated damages. If you miss the vessel Miray is not responsible for the travel arrangements to board in the next port.

**22. SMOKING**

For the safety and security of all guests and staff on board, Designated Smoking Areas are available onboard Miray vessels. Smoking is expressly forbidden in all staterooms and suites, on verandas, or in any areas of the vessel other than officially Designated Smoking Areas. Smoking in a stateroom or suite or on a veranda represents a serious fire and safety hazard to all guests and staff. Guests choosing to disregard this policy will be disembarked at the next port of call and may also be subject to additional fees that will be imposed to cover the costs associated with any damage to and the required cleaning of furnishings, verandas and surrounding deck, and accommodation areas. All areas other than those specified as Designated Smoking Areas will remain smoke-free. This includes all guest suites and staterooms, verandas, restaurants, public areas, the Casino (if offered) and all other areas of the vessel. Cigar and pipe smoking is only permitted on the forward, starboard corner of the Pool Deck. Guests are welcome to use Electronic Cigarettes in designated smoking areas, except in dining venues which includes indoor and outdoor seating.

**23. GRATUITIES**

Gratuities for housekeeping, laundry, and dining service are included in the cruise fare. For your convenience a 18% service gratuity is automatically added to all beverage purchases and spa servies. We believe additional gratuities for additional attention, while optional, is a common courtesy.

**24. TRANSFER CLAUSE – TRANSFER CABIN TO SOMEONE ELSE**

(a) Miray does not offer refunds for any reason a guest cannot complete the trip except as outlined in Section 11 and Section 12. The purchase is transferable, and the guest wanting to transfer rights to the cabin may do so by calling customer support. Customer support will only assist with the transfer/name change. It is the sole responsibility of the purchaser to reassign or resell.

(b) A two-week notice must be provided to embark any guest to meet international manifest requirements. Any guests not on the manifest will not be allowed to board.

(c) Additional Guests – limit 1 additional guest can stay for up to 30 days per quarter in Guest cabin and there can be up to 3 people (including Guests) in a cabin for no more than one week. There can be up to 4 people (including Guests) in a cabin for no more than one week. Port charges and gratuities per person are approximately $33/day. If a Guest is a solo traveler and has paid the full double occupancy rate for the cabin then the Additional Guest policy as outlined in the Section does not apply Additional guest cabins are available on a limited bases on first come first serve and will be charged depending on the cabin type. Children will be permitted onboard, but may not stay for more than one month. All children under the age of 16 must be accompanied by an adult at all times and will not be permitted in bar areas, offices, gym, spa, or business centers.

**25. PET POLICY**

(a) A limit of two cats per cabin will be permitted with a $1000 deposit for each cat, half of which is refundable if no damages to the cabin or any of its components have been incurred and will be subject to additional charges should the damages be more than the deposit amount. All cats will be confined to the cabin and are not permitted in any public spaces. Miray reserves the right to limit the number of cats on the vessel and space is on a first come first serve basis.

(b) Cat litter must be disposed of properly in a bag as part of the cabin trash and must be changed no less than every other day unless needed more frequently. Under no circumstances should any cat litter be

flushed down the toilet, in the sink, or bathtub, and is subject to a $10,000 fine if litter has been found to be flushed. A pet addendum will be provided separately.

**26. INCLUSIVE AMENITIES**

All-inclusive products include dining three times a day at either of the two restaurants, snacks and other food offerings to be available throughout the day and evening, non-alcoholic beverages, including soft drinks (self serve, at meal times, or from bar locations), limited house beer and house wine at dinner, onboard entertainment (special events may be at an additional charge), WIFI, weekly housekeeping, laundry service (self service laundry machines will also be available), usage of the public areas of the business center, fitness center, primary health visits, and friends and family visits unless otherwise specified within the guest contract.

**27. CABIN AMENITIES**

Cabins include linens (bed linens and towels), flat screen tv, mini fridge, hair dryer, coffee machine, iron upon request, underbed storage, and virtual window in inside cabins. Guests can bring their own toiletries, food, and beverage items per regulations within each port. No fresh fruits or vegetables may be brought onboard in any port and will be subject to confiscation and disposal without compensation. Any electronics must be inspected, fire proofed, approved and have automatic shut off.

**28. WHAT TO BUDGET FOR (NON-INCLUSIVE)**

Miray offers salon and spa services, shore excursions, alcoholic beverages and packages, special restaurant events, private classes, and personal training which are not included in the cruise fare. We will provide a list of pricing within three months of embarkation.

**29. MAIL AND PACKAGES**

(a) Miray will be providing a Mail Drop Service for a $50 a month fee once a month. We will provide an U.S. address to forward your mail and packages. All mail and packages will be opened and inspected to ensure it is legally able to be mailed. Items such as Aerosols, Alcoholic Beverages, Ammunition, Cigarettes, Dry Ice, Gasoline, Hemp-based products (including cannabidiol [CBD]), Marijuana (medical or otherwise), Nail Polish, Perfumes (containing alcohol), and batteries will not be permitted. A freight forwarder will handle the shipment and deliver it to the nearest port of call. This information is subject to change and more information will be provided at a later date.

(b) Mail/packages needed urgently can be shipped separately at the Guest's expense directly to the port agent a few days before arriving to port. Please discuss with onboard Customer Service to be provided instructions for shipping.

**30. NOTICE**

While Miray makes every effort to adhere to the specifics shown on the website, circumstances may require otherwise. All information contained herein is subject to change without notice at the discretion of Miray including all schedules and fares listed. Miray is not responsible or liable for any typographical errors, omissions or misprints. Any modifications to the Cruise Contract will be done via Addendum.

**"MIRAY CRUISES, LTD"**

Signature

Printed Name / Title

Date

**"GUEST"**

Signature

Printed Name

Date

**"GUEST"**

Signature

Printed Name

Date

Other Guests in Cabin (Minors) where applicable:

Miray Cruises, Ltd (offering and operating the Life at Sea Cruises brand)
500 E. Broward Blvd, Suite 1710, Fort Lauderdale, FL 33394

# EXHIBIT "E"

**Mike Pettersson** Top contributor

I as founder and Managing Director of Life at Sea Cruises will be happy to share with anyone what is going on. I on May 3rd demanded critical answers from Miray, they refused to answer my questions on where money will be kept, status of FMC bond, verified ports, escrow balances. Miray kept us from accessing Gemini engine room and lied to all of us about the status of the Gemini. The Gemini is completely unseaworthy, cannot get USPH certified, and will never be able to complete a world cruise. I decided to refund everyone their credit card deposits 3 weeks ago and pushed the payment date to June 30 until I can better understand what Miray plans. Miray told me to not ask questions and just collect money they hired me to do. Feel free to reach out to me for complete email trails. Also call the Federal Maritime Commission at (202) 523-5725 to file a complaint.

Like Reply 42m 3

# EXHIBIT "F"

6:13

**LaS Founders Page & Community Information**

Indy Steve · 1h ·

**Mike Pettersson**

Oh we are here enjoying the show. The FMC bond requirement of $32m for customer protection is now no longer required as there will be no passengers EMBARKING in US territory. No performance guarantee, no bond, no escrow, no transparency, just "Trust Us". The lack of USPH requirement, coast guard inspection are just bonuses. As if anyone is dumb enough to buy the story about embarking 40 miles away in Freeport, ferrying passengers from Miami is somehow going to save 1-2 days for Machu Picchu. It's hilarious how gullible they think the residents are. We are busy on our next project, Villa Vie Residences, our original plan which make the residents the majority stakeholders and creators of the project itself. With total transparency and integrity, we will make the dream come true stronger, better than anything else on the market today.

Stay tuned explorers🩶

1h Like Reply

Rules

Write a comment...

Home Friends Watch Notifications Menu

# EXHIBIT "G"

9:19

Life at Sea...

**Mike Pettersson**

Top contributor · 40m ·

Hello World Travelers!
I am very excited to announce that the founders of Life at Sea Cruises (16 of 17 of us) are having our first webinar tomorrow June 22nd at 6pm EST with our new project Villa Vie Residences.
Some of the many highlights include;
- Pay as you go, with deposits of only 10%
- Totally Free Friends & Family visits
- Majority Resident Owned
- Up to 50% Single traveler discount
- Start with any segment and customize your Ultimate World Cruise
- Free Select Shore Excursions
- Fastest and most Reliable Streaming internet at sea
- Escrow utilization and Performance Bonded

Link to sign up for the Webinar:
https://us06web.zoom.us/webinar/register/7516862504495/WN_GQR9ks4UT3a_q5nuCSPPAw
Send questions you would like us to cover in the webinar to mike@villavieresidences.com and I will try to answer as many of them as possible in as little time as possible
Website is https://villavieresidences.com/
We also have a Facebook group https://www.facebook.com/groups/villavie which will provide a fresh start for sharing within the community.
I can't wait to share with everyone what we have

# EXHIBIT "H"

**From:** "Beverley Bunn" <bunn_beverley@yahoo.com>
**Sent:** Sat, 25 Nov 2023 08:07:46 +0000 (UTC)
**To:** "ethem miraycruises.com" <ethem@miraycruises.com>
**Subject:** Cabin 7201

---

Ethem,

Just wanted to confirm my email address for the refund email. Thank you for all you and Miray are doing to honor our contract. So sad this adventure did not begin.

Hope to hear from you soon.

Sincerely,
Beverley Bunn
Cabin7201
Bunn_beverley@yahoo.com

(b) Mail/packages needed urgently can be shipped separately at the Guest's expense directly to the port agent a few days before arriving to port. Please discuss with onboard Customer Service to be provided instructions for shipping.

**30. NOTICE**

While Miray makes every effort to adhere to the specifics shown on the website, circumstances may require otherwise. All information contained herein is subject to change without notice at the discretion of Miray including all schedules and fares listed. Miray is not responsible or liable for any typographical errors, omissions or misprints. Any modifications to the Cruise Contract will be done via Addendum.

| **"MIRAY CRUISES, LTD"** | **"GUEST"** |
|---|---|
| Signature | Anna M. Chomiak<br>Signature |
| Printed Name / Title | ANNA M. CHOMIAK<br>Printed Name |
| Date | 17 July 2023<br>Date |

**"GUEST"**

Signature

Printed Name

Date

Other Guests in Cabin (Minors) where applicable: ______________________________

Miray Cruises, Ltd (offering and operating the Life at Sea Cruises brand)
500 E. Broward Blvd, Suite 1710, Fort Lauderdale, FL 33394

**From:** "George Fox" <georgesfox@msn.com>
**Sent:** Fri, 5 Apr 2024 07:50:07 +0000 (UTC)
**To:** "ethem miraycruises.com" <ethem@miraycruises.com>
**Subject:** From George Fox #6227

---

Good Morning from America, Ethem,

I see on Circle that Miray has been responding to residents and that is encouraging.
I made payments with two credit cards: Wells Fargo and Barclays. Wells Fargo has denied my charge back because 120 days is the expiration to claim. I have spent hours on the phone with them talking to many representatives. They still deny… They say it is VISA POLICY and not the bank policy. I am not hopeful about my Barclays claim because they are also VISA.
Ethem, I request from Miray the full amount you have agreed is the total refund: my wires, my credit card charges and the Turkey/China visa expenditures. That total is $69,920 USD. I am not asking for any interest. If you refund that amount, I will sign the settlement agreement.
And then I will travel to sail on the Gemini when I go next to Ukraine to work in July.
I thank you in advance your understanding.

Best Regards,
George Fox
Sent from my iPhone

**From:** "Michael Walker" <mbwalker@msn.com>
**Sent:** Fri, 22 Dec 2023 18:50:37 +0000 (UTC)
**To:** "ethem miraycruises.com" <ethem@miraycruises.com>
**Subject:** thank you, thank you

---

Ethem –

I have received my $8,000.00 refund.
Thank you very much for this.

I have posted the following to the Circle message that Michael Vargo sent out this morning (USA time).

I want to let everyone know:
At 1:05amPST on December 22nd, I received a notification from my bank that an international wire transfer credit was posted to my account. The amount of the transfer was exactly a full refund of all money (less a $25.00 wire transfer cost imposed upon me by my bank which I was expecting would happen) I had sent to the Life At Sea Cruise bank account in May and June of this year. For me, Miray has fully honored its promise of a full refund of all money I had previously sent to it.

Michael Walker
713 447 6537 (mobile)